Robert R. Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Erich P. Schork (*pro hac vice* to be filed)
*erichschork@robertslawfirm.us*
**ROBERTS LAW FIRM**
PO Box 31909
Chicago, IL 60631-9998
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

Michael L. Roberts (*pro hac vice* to be filed)
**ROBERTS LAW FIRM**
*mikerobert@robertslawfirm.us*
1920 McKinney Avenue, Suite 700
Dallas, TX 75201
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICKOLAS TSUI and WILLIAM LUGO, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>     v.<br><br>UNIVERSAL SERVICES OF AMERICA, LP, ALLIED UNIVERSAL TOPCO LLC, ALLIED UNIVERSAL BENEFITS COMMITTEE, and JOHN AND JANE DOES 1-10,<br><br>              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Nickolas Tsui and William Lugo ("Plaintiffs"), individually and on behalf of similarly situated current and former participants in and beneficiaries to the Allied Universal 401(k) Plan (the "Plan"), by and through their attorneys, hereby allege as follows.

## I.    NATURE OF THE ACTION AND INTRODUCTION

1.    This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants and beneficiaries. This action asserts claims for breaches of fiduciary duties and other violations of ERISA under 29 U.S.C. §§ 1132(a)(2) and (3) from June 13, 2016 to the present and continuing (the "Class Period") against the Plan's fiduciaries, which include: Universal Services of America, LP ("USA"); Allied Universal Topco LLC ("AUT"); Allied Universal Benefits Committee ("Committee"); and John and Jane Does 1-10 (collectively, "Defendants").

2.    Every year, millions of employees entrust their retirement savings to plans established under ERISA, like the Plan. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act prudently to protect Plan participants and their hard-earned retirement dollars—the essential remedial purpose of ERISA.

3.    ERISA fiduciaries have a continuing duty to evaluate fees and expenses assessed to a plan to make sure those charges are and remain reasonable and prudent.

4.    ERISA fiduciaries' failures to monitor plan costs — such as plan recordkeeping and administration costs — for reasonableness have stark financial consequences for retirees. Every extra level or dollar of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

5.      The table below illustrates how fees impact retirement accounts over time[1]:



**Portfolio Value From Investing $100,000 Over 20 Years**

In 20 years, 0.50% annual fees reduce portolio value (red line) by $10,000 compared to a portfolio with a 0.25% annual fee (blue line).

In 20 years, 1.00% annual fees reduce portfolio value (green line) by nearly $30,000, compared to a portfolio with a 0.25% annual fee (blue line).

— 4% annual return less 0.25% annual fee

— 4% annual return less 0.50% annual fee

— 4% annual return less 1.00% annual fee

6.      The above table illustrates that where an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000, or 14%, less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference is substantial. The impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged nearly double (7%) the 4% depicted in the SEC table *supra*.[2]

---

[1] *See Investor Bulletin Mutual Funds Fees and Expenses*, SEC, https://www.sec.gov/files/ib_mutualfundfees.pdf (last visited June 13, 2021).

[2] *See, e.g.*, Alicia H. Munnell, et al., *Investment Returns: Defined Benefit vs. Defined Contribution Plans*, CENTER FOR RETIREMENT RESEARCH AT BOSTON COLLEGE 3 Table 4 (Dec. 2015 No. 15-21), https://crr.bc.edu/wp-content/uploads/2015/12/IB_15-211.pdf.

7.     The impact of excessive or unreasonable fees on defined contribution plan participants' accounts is well-recognized. As recognized by the United States Court of Appeals for the Third Circuit:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan . . . by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.[3]

8.     ERISA imposes a strict fiduciary duty of prudence upon Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a). ERISA's fiduciary duties are among the highest duties known to the law, requiring fiduciaries to perform their obligations solely in the best interests of a plan's participants and beneficiaries. As fiduciaries to the Plan, Defendants were obligated to act for the exclusive benefit of Plan participants and beneficiaries,[4] including ensuring that fees and expenses charged to the Plan were reasonable. Defendants had a continuing duty to evaluate Plan recordkeeping and administration fees and expenses to ensure such charges were reasonable and appropriate.

9.     Defined contribution retirement plans are often categorized in terms of the value of plan assets. For example, plans with less than $5 million in assets are classified as "micro" plans, plans with between $5 and $50 million in assets are considered "small" plans, plans with assets between $50 and $200 million in assets are considered "mid" plans, and plans with greater than $200 million in assets are considered "large" plans.

10.     With 17,513 participants with account balances and nearly $277 million in net assets as of December 31, 2020, based on publicly available Form 5500 data, the Plan is larger than 99.91% of defined contribution plans in terms of participants and larger than 99.40% of plans in terms of assets. Thus, the Plan is considered a "large" retirement plan.

---

[3] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (internal citation and quotations omitted).

[4] The term "participants" as used herein refers to Plan participants and beneficiaries with account balances during the Class Period.

CLASS ACTION COMPLAINT

11.     Because the marketplace for retirement plan administrative services is well-established and highly competitive, such services have become commoditized. Given that there was nearly $277 million in net assets in the Plan during the Class Period, the Plan had tremendous bargaining power to demand low-cost administrative and investment management services.

12.     Prudent plan fiduciaries continuously monitor plan recordkeeping and administrative fees to ensure those fees remain reasonable in relation to the services provided and competitive with those being assessed to analogous plans with similar assets and numbers of participants. Prudent plan fiduciaries periodically put plan recordkeeping services out for a competitive bidding process to ensure a plan is achieving a reasonable administrative fee structure.

13.     But instead of leveraging the Plan's substantial bargaining power to benefit Plan participants and beneficiaries, Defendants caused the Plan to pay unreasonable and excessive fees for recordkeeping and administration ("RK&A") services in relation to the services being provided to the Plan.

14.     During the Class Period Defendants breached their duties owed to the Plan, Plaintiffs, and other Plan Participants by:

     a.     failing to monitor RK&A fees paid by the Plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive RK&A fees, relative to RK&A services received; and

     b.     failing to take standard and customary actions to understand the market for RK&A services to monitor for reasonableness of RK&A fees paid by the Plan in relation to RK&A services received.

15.     Throughout the Class Period, Defendants maintained, administered, and sponsored the Plan and were responsible for selecting, monitoring, and retaining third parties to provide investment, recordkeeping, and other administrative services.

16.     As the sponsor and administrator of the Plan, Defendants exercised discretionary authority and control over the Plan and constitute a plan fiduciary as defined by 29 U.S.C. § 1002(21)(A). As the Plan's fiduciaries, Defendants were obligated to act for the exclusive benefit of Plan participants and to ensure the Plan's expenses were fair, reasonable, and appropriate.

17.     Defendants breached these fiduciary duties by allowing unreasonable and excessive recordkeeping and administrative fees to be charged to Plaintiff and other Plan participants.

18.     The Plan's objectively unreasonable RK&A fees cannot be justified. During the Class Period, the Plan paid at least as high as $119 per participant for RK&A services. During the Class Period, reasonable RK&A fees for a plan of this size averaged $36 per participant annually.

19.     Defendants' failure to monitor RK&A fees and ensure their reasonableness breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Defendants did not engage in prudent decision-making processes, as there is no other explanation for why the Plan paid objectively unreasonable fees for RK&A services.

20.     Plaintiffs were injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive RK&A fees, which reduced Plaintiffs' Plan account balances and caused them significantly diminished investment returns.

21.     To remedy Defendants' fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

22.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan

filings with the United States Department of Labor ("DOL"), other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials become available in the course of this litigation.

## II.    JURISDICTION AND VENUE

23.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001, *et seq*.

24.    This Court has personal jurisdiction over Defendants because at all relevant times, including during the Class Period, they transacted business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

25.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, the Plan is deemed to reside in this District, some or all ERISA violations alleged herein took place in this District, and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    THE PARTIES

### A.    PLAINTIFFS

**Plaintiff Nickolas Tsui**

26.    Plaintiff Nickolas Tsui is a resident of Nashua, New Hampshire.

27.    Mr. Tsui had a vested account balance in the Plan during the Class Period. Mr. Tsui participated in the Plan through his employer, Allied Universal. Mr. Tsui has participated in the Plan during the period of 2018 through the present.

28.    During the Class Period, Mr. Tsui paid excessive recordkeeping fees directly and indirectly through revenue sharing.

29.     During the Class Period, Mr. Tsui held investments in Plan investment options that, upon information and belief, paid revenue sharing.

30.     During the Class Period, and per the Plan's public Form 5500s, Mr. Tsui paid Massachusetts Mutual Life Insurance Company ("Mass Mutual")[5] indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

31.     Mr. Tsui did not have knowledge of all material facts (including, among other things, RK&A fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Tsui lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

32.     Mr. Tsui was previously a participant in a retirement plan sponsored by Wal-Mart during his employment with Sam's Club that, on information and belief, was recordkept and administered by Merrill Lynch. Mr. Tsui discerns no noticeable difference in the level of services being provided to the Plan by Mass Mutual as compared to the services provided to the Wal-Mart plan during his time as a participant in that plan.

**Plaintiff William Lugo**

33.     Plaintiff William Lugo is a resident of Brooklyn, New York.

34.     Mr. Lugo had a vested account balance in the Plan during the Class Period. Mr. Lugo participated in the Plan through his employer, Allied Universal. Mr. Lugo has participated in the Plan during the period of fall of 2015 through the present.

35.     During the Class Period, Mr. Lugo paid excessive recordkeeping fees directly and indirectly through revenue sharing.

36.     During the Class Period, Mr. Lugo held investments in Plan investment options that, upon information and belief, paid revenue sharing.

---

[5] Empower Retirement purchased Mass Mutual's retirement plan business in early 2021. References to Mass Mutual in this Complaint refer to Mass Mutual prior to 2021, and Empower in Plan year 2021 forward.

37.     During the Class Period, and per the Plan's public Form 5500s, Plaintiff paid Mass Mutual indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

38.     Mr. Lugo did not have knowledge of all material facts (including, among other things, RK&A fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Lugo lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

39.     Mr. Lugo was previously a participant in a retirement plan sponsored by FJC Security Services that, on information and belief, was recordkept and administered by another plan service provider. Mr. Lugo discerns no noticeable difference in the level of services being provided to the Plan by Mass Mutual as compared to the services provided to the FJC Security Services plan during his time as a participant in that plan.

**B.      DEFENDANTS**

40.     Defendant Universal Services of America, LP ("USA") is a California corporation with a principal place of business located at 1551 N. Tustin Ave. Suite 650, Santa Ana, California 92705.

41.     Defendant Allied Universal Topco LLC ("AUT") is a Delaware corporation with a registered agent address located at 251 Little Falls Drive, Wilmington, Delaware 19808.

42.     Defendant Allied Universal Benefits Committee is and was, on information and belief, at all relevant times during the Class Period, located at 1551 N. Tustin Ave. Suite 650, Santa Ana, California 92705.

43.     Defendants John and Jane Does 1-10 are unknown individuals comprising of the Committee or any other relevant Plan committees; any officers, directors, or employees of Defendants; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiffs reserve

the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

44.     Per the Plan's Form 5500 for 2020, Defendant USA was the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B). The Plan's Summary Plan Description separately identifies the Committee as the Plan Administrator.

45.     As the Plan Administrators, USA and the Committee were fiduciaries responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). These Defendants had authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). USA and the Committee had responsibility and discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of recordkeeping and administrative services to the Plan. USA acted through its officers, directors, other individuals, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. USA and the Committee appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

46.     On information and belief, USA and/or the Committee were responsible for the oversight and administration of the Plan and had authority to manage and control the administration and operation of the Plan, including with respect to selection and retention of recordkeeping and administrative services providers. They exercised authority and control over Plan management and Plan assets, and thus are Plan fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

47.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan, and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

CLASS ACTION COMPLAINT

## IV.   ALLIED UNIVERSAL 401(k) PLAN

48.    The name of the Plan is the Allied Universal 401(k) Plan. The Plan's Employer Identification Number (EIN) is 27-1562945 and the Plan has been assigned the three-digit plan number 001.

49.    The Plan is subject to ERISA and, on information and belief, established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

50.    The Plan is a defined contribution retirement plan, pursuant to 29 U.S.C. §§ 1002(2)(A) and 1002(34). In defined contribution plans, the value of a participant's retirement account is determined solely by, and thus is limited to, employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. Plan Participants may contribute a percentage of their pre-tax or post-tax earnings to the Plan through an individual account, which is invested in investment options chosen from an investment lineup selected by the Plan's fiduciaries. In addition to employee deferrals, Participants who satisfy eligibility conditions established under the Plan may be eligible to receive pre-tax employer contributions under the Plan.

51.    The Plan provides the primary source of retirement income for many employees of Allied Universal and other employees of Defendants. Per the Form 5500s, "[t]he Plan covers eligible employees of Allied Universal Topco LLC and its affiliates."

52.    The ultimate amount of retirement benefits provided to Plan participants depends on the performance of investment options chosen for the Plan by Defendants, net of fees and expenses. Participants had the right to direct the investment of their account dollars to the available investment choices chosen by the Plan fiduciaries.

53.    The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: RK&A fees (primarily comprised of recordkeeping and plan administration), and investment management fees. These expenses significantly reduce the value of an account in a plan. The Plan fiduciaries were required to control Plan expenses, including those associated with the service providers selected and hired to administer the Plan (e.g., recordkeepers). The Plan fiduciaries were also

responsible for negotiating and approving fees paid to Plan service providers, whether directly or indirectly paid.

54.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees can dramatically reduce the benefits available when the participant is ready to retire. Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

55.     The impact of excessive fees on the Plan's employees' and retirees' retirement assets is dramatic. The Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[6]

56.     Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a survey conducted by TD Ameritrade, of 1,000 investors, only 27% believed they knew how much they were paying in fees as participants in 401(k) plans.[7] It is incumbent upon plan fiduciaries to look out for plan participants, protect their retirement dollars, and make sure fees remain reasonable.

## V.     FACTUAL BACKGROUND
### A.     RETIREMENT PLAN SERVICES IN DEFINED CONTRIBUTION PLANS

57.     Defined contribution plans, such 401(k)s, are the most common type of employer-sponsored retirement plan. Under defined contribution plans, the assets are

---

[6] *A Look at 401(k) Plan Fees*, UNITED STATES DEP'T OF LABOR 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[7] *See Three-Quarters of Americans Are in the Dark When it Comes to 401(k) Fees*, BUSINESSWIRE (Jan. 29, 2018), https://www.businesswire.com/news/home/20180129005124/en/Three-Quarters-of-Americans-Are-in-the-Dark-When-it-Comes-to-401-k-Fees.

generally held in a single trust and allocated by a retirement plan services provider (often referred to as a "recordkeeper").

58.     Fiduciaries of virtually all "large" defined contribution plans hire a single services provider to provide RK&A services. RK&A services are necessary for defined contribution plans, and these services often include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

59.     Some RK&A service providers provide purely recordkeeping, administration, and related services, while others are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options. Here, the Plan's overpayment of RK&A service fees is solely attributable to excessive fees for pure recordkeeping and administration services to the Plan.

60.     Retirement plan service providers typically offer the RK&A services as a bundle of services that are provided to all plan participants. Retirement plan service providers also charge separate additional fees for individual transactions and services that are utilized only by specific participants, e.g., loan initiation and maintenance fees. The fees charged for participant-specific services typically account for an insignificant portion of the total fees charged for providing RK&A services and are not included in the bundled fee for the RK&A services provided to all plan participants.

61.     Since the mid-2000s, the retirement plan services provided to "large" defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most recordkeepers offer the same bundles and combinations of services as other competitor recordkeepers. As a result, the market for defined contribution retirement plan services is

highly competitive, particularly for "large" plans that, like the Plan, have a sizable number of participants and a large amount of assets.

62.   In recent decades, the fee RK&A service providers have been willing to accept for providing services has significantly decreased.

63.   By the start of and during the entire Class Period, the level of fees that service providers have been willing to accept for providing RK&A services has stabilized and has not materially changed. In other words, reasonable RK&A fees paid, e.g., in 2018 or 2019, are representative of the reasonable fee for RK&A services during the entire Class Period.

64.   Recordkeepers for larger defined contribution plans, like the Plan, experience efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the recordkeeper can spread the cost of providing RK&A services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis. The larger the retirement plan, the more negotiating power a plan fiduciary has when negotiating recordkeeping and administrative fees.

65.   Moreover, the cost to a recordkeeper to provide RK&A services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. In other words, the average cost to provide RK&A services is materially identical for a participant that has $10,000 and a participant that has $100,000 or $1,000,000 in plan assets.

66.   Therefore, while the total cost to provide RK&A services increases as more participants join the plan, the cost per participant to deliver the services decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

67.     Sponsors of defined contribution plans negotiate and contract for RK&A services separately from any contracts related to the selection of investment management services provided to plan participants.

68.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of plan services that the recordkeeper provides on behalf of the investment manager.

69.     As a result, plan service providers often make separate contractual arrangements with mutual fund providers. Retirement plan service providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known in the defined contribution industry as "revenue sharing."

70.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the retirement plan service provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

71.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to plan services and, in some cases, other services provided to a plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

72.     Providers of retirement plan services, including RK&A services, typically collect their fees through direct payments from a plan or through indirect compensation such as revenue sharing, or some combination of both.

73. Regardless of the pricing structure that the plan fiduciaries negotiate with the recordkeeper, the amount of compensation paid to the recordkeeper for the RK&A services must be reasonable.

74. Therefore, plan fiduciaries must understand the total amounts being paid to plan service provider(s) and be able to determine whether the compensation is reasonable by evaluating what the market is for the RK&A services being received by the plan.

75. Because RK&A fees are actually paid in dollars and because of the cost dynamic noted *supra*, the fees paid such services are evaluated and compared on a dollars-per-participant basis.

76. It is axiomatic in the RK&A services industry that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis, and that as participant counts increase, the effective per-participant RK&A fee should decrease, assuming the same services are provided.

77. At all times during the Class Period, numerous high quality recordkeepers provided the same identical bundle of services to plans of a similar size as the Plan which included all of the following services:

a.   recordkeeping;

b.   transaction processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   administrative services related to converting a plan from one recordkeeper to another;

d.   participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., summary plan descriptions and other participant materials);

- 15 -

CLASS ACTION COMPLAINT

e.   plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

f.   plan consulting services, including assistance in selecting the investments offered to participants;

g.   accounting and reporting services, including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

h.   compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of a plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm);

i.   compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules;

j.   loan processing;

k.   distribution services; and

l.   processing of qualified domestic relations orders.

**B.   STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING AND MONITORING RETIREMENT PLAN SERVICE PROVIDERS**

78.   Plan fiduciaries are required to fully understand all sources of revenue received by retirement plan service providers or recordkeepers. Fiduciaries must regularly monitor the revenue being paid to retirement plan service providers to ensure that the compensation received is and remains reasonable in view of the services being provided.

79.   The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and

"[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[8]

80.     The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[9] *See also Tibble v. Edison Intern.*, 575 U.S. 523, 525 (2015) ("Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan.").

81.     Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for RK&A services by periodically soliciting competitive bids from service providers to perform the same services currently being provided to the plan. For plans with many participants, like the Plan, most RK&A service providers would require only the number of participants and the amount of the assets to provide a quote for services, while others might only require the number of participants.

82.     Prudent fiduciaries have all this information readily available and can easily receive a quote from other RK&A service providers to determine if the current level of fees being charged to the plan is reasonable.

83.     Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers, and do so on a periodic basis (e.g., three- or five-year increments).

84.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated service fee. The employer can pay RK&A service fees on behalf of participants, which is the most beneficial to plan participants. If the employer is paying

---

[8] *See* n.6, *supra* (*A Look at 401(k) Plan Fees*).

[9] *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, *2017*, INVESTMENT COMPANY INSTITUTE 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the RK&A fees. If the fees are paid by participants, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

85.   In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate RK&A fees pro rata to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 for retirement plan services. If the plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the plan could allocate the $500,000 to participants by requiring that each participant pay 10 basis points.

86.   In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the plan services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

87.   In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, RK&A, and sometimes other retirement plan services on behalf of the mutual fund. These fees include: 12b-1 fees, which are paid by the funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees.

88.     Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable RK&A fees.

89.     Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue from any source (including revenue sharing payments) that exceeds a reasonable RK&A fee based on the market rate for the same services.

90.     The standard of care outlined above was well-known and well-established prior to the Class Period among prudent plan fiduciaries based on U.S. Department of Labor ("DOL") guidelines, case law, and best practices as shared by retirement plan professionals. For example, the standard of care exercised by prudent retirement plan professionals was described by Mercer Investment Consulting, a prominent retirement plan investment consultant, and included, but was not limited to, the following:

    a.    Price administrative fees on a per-participant basis.

    b.    Benchmark and negotiate recordkeeping and investment fees separately.

    c.    Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.

    d.    Benchmark and negotiate recordkeeping and trustee fees at least every other year.

    e.    Review services annually to identify opportunities to reduce administrative costs.[10]

---

[10] "Mercer's Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, MERCER INVESTMENT CONSULTING 3-4 (2013).

91.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.

92.     *First*, fiduciaries must pay close attention to the recordkeeping fees being paid by the plan. A hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

93.     *Second*, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

94.     *Third*, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will often include conducting a request for proposal ("RFP") process at reasonable intervals. More specifically, it was understood that the best practice standard of care was that an RFP should be issued once every three to five years.

95.     That said, by merely soliciting bids from other plan service providers (without even resorting to an RFP process), plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical plan services and determine a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to service providers to provide a competitive bid.

96.     To assist plan sponsors and other plan fiduciaries in fulfilling their fiduciary duties under ERISA, the Employee Benefits Security Administration (EBSA) has offered the following tips, among others, relevant to identifying, selecting, and monitoring plan service providers, including RK&A service providers:

    a.    Present each prospective service provider identical and complete information regarding the needs of your plan. . . . [G]et formal bids from those providers that seem best suited [to the plan's needs];

    b.    Ask each prospective provider to be specific about which services are covered for the estimated fees and which are not. Compare the information you receive, including fees and expenses to be charged by the various providers for similar services;

    c.    In particular, understand what obligations both you and the service provider have under the agreement and whether the fees and expenses to be charged to you and plan participants are reasonable in light of the services to be provided;

    d.    Prepare a written record of the process you followed in reviewing potential service providers and the reasons for your selection of a particular provider;

    e.    Receive a commitment from your service provider to regularly provide you with information regarding the services it provides; and

    f.    Periodically review the performance of your service providers to ensure that they are providing the services in a manner and at a cost consistent with the agreements.[11]

---

[11] *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, UNITED STATES DEP'T OF LABOR, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (last visited June 13, 2022).

97.     All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

**C.      THE PLAN IMPRUDENTLY PERMITTED EXCESSIVE RK&A SERVICE FEES TO BE PAID TO MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY AND EMPOWER**

98.     At all relevant times, the Plan's RK&A fees were excessive when compared with other similar-size plans receiving materially identical services. The fees charged to the Plan were excessive relative to the RK&A services received by the Plan. These excessive fees led to lower net returns, depleting and substantially reducing Plaintiffs' and Plan participants' retirement savings.

99.     Between 2016 and 2022 and, on information and belief, continuing, Plan participants paid for RK&A services directly through fees deducted from their accounts and indirectly through revenue sharing. From at least 2016-2020, each Plan participant paid an RK&A service fee, on average, of approximately $96 per year deducted directly from their accounts. This amount alone is nearly triple the reasonable RK&A fee for a plan this size.

100.    In addition to collecting, on average, approximately $96 per year from each Plan participant by directly extracting the fee from participant accounts, the Plan (i.e., the participants) paid additional fees indirectly through revenue sharing in 2016 and 2017.

101.    During the Class Period, the Plan has disclosed payment of the following direct compensation to Mass Mutual and Empower[12] in Schedule C of the Plan's Forms 5500:

---

[12] Empower now owns Mass Mutual's retirement plan business. *See* n.5, *supra*.

| Compensation to Mass Mutual/Empower (source: Forms 5500, Schedule C) | |
|---|---|
| Plan Year | Direct |
| 2016 | $189,105 |
| 2017 | $342,312 |
| 2018 | $1,197,051 |
| 2019 | $1,360,998 |
| 2020 | $1,374,620 |
| Total | $4,464,086 |

102.   Form 5500 for Plan year 2021 is not yet available, but on information and belief, based upon the amounts paid to Mass Mutual in 2019 and 2020, the amount of direct compensation paid to Empower in 2021 was in excess of $1.37 million. On further information and belief, Empower will receive a similar or greater amount of direct compensation for plan services in Plan year 2022, meaning that from 2016 to 2022, Mass Mutual/Empower will have been paid at least $8.1 million in direct compensation.

103.   During the Class Period, based upon industry expertise and publicly available information concerning the Plan, on information and belief, Mass Mutual/Empower also received indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

104.   The chart below provides a conservative estimate of the compensation paid to and received by Mass Mutual/Empower from the Plan during the Class Period between 2016-2020, including estimated conservative indirect compensation and estimated administrative credits to the Plan[13]:

_____

[13] The RK&A fees set forth in the table are conservative and likely to be lower than the actual RK&A fees paid by Plaintiffs and Participants, as the amounts in the table include actual reported direct compensation, conservative estimates of indirect compensation, and conservatively assume that Mass Mutual/Empower returned indirect compensation to the Plan in some years based upon disclosures in Plan documents. It is likely, however, that Mass Mutual/Empower did retain some of the indirect compensation it received from the Plan. For 2017, estimated per-participant RK&A fees may be lower than actual

| RK&A Fees Per-Participant Cost | | | | | | |
|---|---|---|---|---|---|---|
| | Plan Year | | | | | |
| | **2016** | **2017** | **2018** | **2019** | **2020** | ***Average*** |
| Participants with Balances | 3,739 | 10,905 | 10,922 | 13,115 | 17,513 | *11,239* |
| RK&A Direct Compensation | $189,105 | $342,312 | $1,197,051 | $1,360,998 | $1,374,620 | |
| Est Conservative RK&A Indirect Compensation | $255,814 | $681,472 | $15,143 | $19,101 | $133,734 | |
| Est Conservative Admin Credit | $0 | $0 | ($15,143) | ($19,101) | ($133,734) | |
| **Est Conservative RK&A Fees** | $444,919 | $1,023,784 | $1,197,051 | $1,360,998 | $1,374,620 | *$1,080,274* |
| **Per-Participant RK&A Fee** | $119 | $94 | $110 | $104 | $78 | *$96* |

105.  On information and belief, during the Class Period, the Plan paid over $1 million in RK&A fees per year in multiple years.

106.  During the Class Period, Plaintiffs and Plan participants paid as much as $119 in RK&A expenses in a year. In 2020, the last Plan year for which information is currently available, Plan participants paid over $78.

107.  The table illustrates that the Plan had on average 11,239 participants and conservatively estimates that the Plan paid an average effective annual RK&A fee of approximately $1,080,274 for years 2016-2020, which equates to an average of approximately $96 per participant, per year.

108.  On information and belief, per participant RK&A fee for Plan years 2021 and 2022 will be similar or higher.

109.  These fees were and are exorbitant and unreasonable. Defendants' decision to maintain a relationship with Mass Mutual/Empower during the Class Period in which Plan participants were paying on average $96 (or higher) per person per year was imprudent.

---

RK&A fees due to a large number of participants being merged into the Plan during the year and therefore direct compensation would have been higher if the participants had been in the plan for the full year.  Because the Plan fiduciaries did not disclose all of the compensation Mass Mutual/Empower received from the Plan in its Form 5500s, discovery will be necessary to determine the additional compensation received by it.

CLASS ACTION COMPLAINT

This high per-participant RK&A expense is not in line with the fees paid by participants in other similar plans administered by prudent fiduciaries receiving materially identical services.

110.   The table above also largely reflects that RK&A fees for the Plan did not decline in correlation with the year-over-year increase of Plan participants, which grew from 3,739 to 17,513 persons with account balances from 2016 to 2020. The cost of adding participants to a recordkeeping platform is relatively low, and when participant numbers grow, the unit cost of delivering services on a per-participant basis should decrease. This inverse correlation of participants to the effective annual per participant RK&A fees was not manifested in the Plan during the Class Period. Prudent fiduciaries should have been able to achieve a decrease in the annual per-participant RK&A fee as the number of participants in the Plan grew, but Defendants failed to do so.

111.   The Plan's fiduciaries were required to continuously monitor RK&A fees, and to regularly solicit competitive bids to ensure fees paid to the Plan recordkeeper were reasonable. However, Defendants failed to employ prudent processes for ensuring that fees were and remained reasonable. To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable fees paid for RK&A services.

112.   Due to Defendants' fiduciary failures and the absence of prudent fiduciary processes to monitor fees for reasonableness, the Plan's RK&A fees were significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than RK&A fees assessed to participants in similar plans receiving materially identical services.

113.   The table below illustrates the effective annual per participant RK&A fees paid in 2018 by other comparable plans with similar numbers of participants derived from Form 5500 filings, compared to the average effective annual per participant RK&A fee paid by the Plan (as identified in the table above) during the Class Period.

**Comparable Plans' RK&A Fees Based on
Publicly Available Information from Form 5500[14]**

| Plan | Participants | Assets | RK&A Fee | RK&A Fee /pp | Recordkeeper | Graph Color |
|------|-------------|--------|----------|--------------|--------------|-------------|
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Flowers Foods, Inc. 401(k) Retirement Savings Plan | 10,789 | $607,338,501 | $532,282 | $49 | Great-West | White |
| **Allied Universal Average Fee** | **11,239** | **$177,021,398** | **$1,080,274** | **$96** | **Mass Mutual** | **Red** |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard | White |

114.   Similarly, the graph below illustrates the average annual RK&A fee paid by the Plan compared to the effective annual per participant RK&A fee paid by the plans identified in the table above for materially identical services, with the white data points representing RK&A fees that recordkeepers offered to (and were accepted by) the comparable Plans:

---

[14] Price calculations are based on 2018 Form 5500 information.

CLASS ACTION COMPLAINT



115.   As the above graph makes clear, during the Class Period both smaller plans (for which the reasonable RK&A fees are higher) and plans of a comparable size to the Plan paid significantly lower per-participant RK&A fees than the Plan.

116.   This graph illustrates that other plan service providers as well as the Plan's own recordkeeper would have accepted much lower fees for the identical services received by the Plan.

117.   All the comparable plans received at least all the services set forth in paragraph 77, *supra*.

118.   Mass Mutual did not provide any different or unique services in addition to the services set forth above to warrant any additional fees.

119.   The service provided by Mass Mutual as Plan recordkeeper did not justify paying on average nearly three times the reasonable rate for materially identical services.

120.   Plan sponsors can cap the amount each plan participant pays as a fee for recordkeeping and administration, but on information and belief, Defendants failed to do so.

121.   Had Defendants been acting in the exclusive best interest of the Plan's participants and engaged in prudent processes for selecting and negotiating with RK&A service providers, rather than paying an effective average of at least $96 (likely higher) per participant per year during the Class Period, the Defendants would have put RK&A services out for periodic bidding and would have identified and negotiated with a market-competitive service provider that would have accepted on average around $36 per participant per year for the Plan.

122.   The $96 per-participant-per-year average is nearly three times the amount charged to participants in similar plans where prudent fiduciaries have established and maintained a prudent recordkeeping setup. Prudent fiduciaries would have never initially agreed to the RK&A fees being assessed to the Plan participants starting in 2016, nor would prudent fiduciaries have permitted the unreasonable fees to continue in perpetuity.

123.   During the Class Period, Fidelity, Vanguard, Empower, T. Rowe Price, Voya and Transamerica, among others, offered the identical package of services set forth in paragraph 77, *supra*, at a materially identical or superior level of quality as those provided by Mass Mutual to the Plan.

124.   Upon information and belief, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees being paid to Mass Mutual. Upon information and belief, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to Mass Mutual/Empower vis-à-vis the fees that other providers would charge for the same services.

125.   Defendants knew or should have known that ERISA's duty of prudence required them to engage in processes to evaluate the Plan's RK&A fees, but Defendants simply failed to do so. Had Defendants done so, they would have realized that the Plan was compensating Mass Mutual unreasonably and inappropriately in view of the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan participants, and that the fees were excessive relative to the services received.

126.   Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A fees and their failure to take effective remedial actions shows a lack of or a complete disregard for a prudent process and was a breach of their fiduciary duties to Plaintiffs and the Plan participants.

127.   Defendants imprudently failed to monitor and control the compensation paid by the Plan for RK&A services received by the Plan's recordkeeper.

128.   Had Defendants conducted an RFP for recordkeeping services or merely solicited competitive bids, they would have learned (as demonstrated by the charts above) that other recordkeeping providers offered the same or similar RK&A services provided by Mass Mutual/Empower for half or less than half of what the Plan paid in direct compensation. Defendants' failure to conduct an RFP for many years and during the Class Period was a breach of their fiduciary duty to prudently monitor Plan fees and assure such fees were reasonable, ignored DOL and EBSA guidance on selecting, retaining, and overseeing RK&A service providers and their fees, and caused harm to the Plan and its participants.

129.   As alleged herein, Defendants' failure to control costs for RK&A services was a result of its imprudent processes, or lack of processes, for controlling these costs.

130.   Based on fees paid by other large plans receiving materially identical recordkeeping and administrative services, some of which used the same service provider, it is reasonable to infer that the Plan's fiduciaries failed to follow a prudent process to ensure that the Plan was paying only reasonable fees. In light of the amounts remitted to Mass Mutual/Empower throughout the Class Period, Defendants clearly either engaged in virtually no examination, comparison, or benchmarking of the RK&A fees of the Plan to those of other similarly sized defined contribution plans, or they were complicit in paying grossly excessive fees.

131.   Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties to the Plan. To the extent Defendants had a

process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping and administrative services. Had Defendants appropriately monitored the compensation paid to Mass Mutual/Empower and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

132.   Had Defendants followed a prudent process to monitor the compensation paid to the Plan's recordkeepers Mass Mutual/Empower for RK&A services, Defendants would have identified several other quality recordkeepers willing to provide materially identical RK&A services to the Plan for an effective fee of, on average, around $36 per participant and/or Mass Mutual/Empower would have agreed to decrease its fee to, on average, an effective fee of around $36 per participant. Other similar recordkeepers (e.g., Fidelity, Vanguard) that provide RK&A services to similar plans provide identical or near-identical services to plans at around the $36 per participant fee amount. Indeed, Mass Mutual/Empower provide the same or nearly-identical services as their competitors to similar plans. *See* ¶ 77, *supra*. These competitors regularly assess drastically reduced per participant fees in similar plans, highlighting the imprudence of the fees assessed to Plan participants for RK&A. *See* ¶ 114, *supra* (table); ¶ 115, *supra* (table). Had Defendants exercised prudence in selecting and monitoring the Plan's RK&A service providers and in monitoring RK&A fees for reasonableness, and adhered to the standard of care, Defendants would not have maintained, and would not still be maintaining, Mass Mutual/Empower as the Plan's RK&A service provider, or would have renegotiated the fees being charged to the Plan by Mass Mutual/Empower for RK&A services years ago.

133.   Had Defendants monitored the compensation paid to the Plan's recordkeeper and ensured that participants were only charged reasonable fees for RK&A services, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

## VI.     ERISA'S FIDUCIARY STANDARDS

134.   Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or the other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

135.   Defendants are Plan fiduciaries. ERISA imposes a strict fiduciary standard of prudence on Defendants as fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

(a)     Prudent man standard of care

   (1)   . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

      (A)  for the exclusive purpose of:

         (i)   providing benefits to participants and their beneficiaries; and

         (ii) defraying reasonable expenses of administering the plan; [and]

      (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

                           * * *

      (D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

136.   29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

137.   ERISA fiduciary duties are the highest known to the law and must be performed with an eye exclusively to the interests of participants. ERISA fiduciaries

exercising authority or control over plan assets, including the selection of plan service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of others, including service providers to the Plan such as recordkeepers or firms who provide investment products and services. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. § 1103(c)(1).

138.   Defendants' fiduciary duties apply continuously in the administration of the Plan and do not abate upon the engagement of service providers. Fiduciaries must ensure that the amount of fees paid to service providers is reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for reasonableness.

139.   ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

140.   29 U.S.C. § 1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. § 1109(a), which provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

141.   ERISA Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## VII.   CLASS ACTION ALLEGATIONS

142.   Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

143.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

144.   Pursuant to Federal Rules of Civil Procedure 23, Plaintiffs bring this action on behalf of, and seek to certify and be appointed as representatives of, the following class (the "Class"):

> All participants in and beneficiaries to the Allied Universal 401(k) Plan with account balances from June 13, 2016 through the date of judgment.

145.   Excluded form the Class are Defendants, any Plan fiduciaries, and the Judge assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

146.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

147.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class.

148.   **Existence and Predominance of Common Questions of Law and Fact**: Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.   whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b.   whether Defendants were fiduciaries to the Plan under ERISA;

c.   whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d.   whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e.   if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

f.   whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

CLASS ACTION COMPLAINT

149.   Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

150.   **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

151.   **Adequacy:** Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent; they were participants in the Plan during the Class Period; and they are committed to vigorously representing the Class. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

152.   **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-

mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

153.   Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## VIII.  CAUSES OF ACTION

### COUNT I
**29 U.S.C. § 1104 - Breach of Duty of Prudence**
**Imprudent and Unreasonable RK&A Fees**
**(On Behalf of Plaintiffs and the Class)**

154.   Plaintiffs incorporate the above allegations as if fully set forth herein.

155.   Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

156.   29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

157.   Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

158.   During the Class Period, Defendants had a fiduciary duty to do all of the following:

    a.   ensure that the Plan's RK&A fees were reasonable;

    b.   manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

    c.   defray reasonable expenses of administering the Plan; and

    d.   act with the care, skill, diligence, and prudence required by ERISA.

159.   During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding

recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

160.   During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by:

      a.    allowing the Plan to pay multiples of the reasonable per participant amount for the Plan's RK&A fees;

      b.    failing to properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures;

      c.    failing to defray reasonable expenses of administering the Plan; and

      d.    failing to act with the care, skill, diligence, and prudence required by ERISA.

161.   During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

162.   Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

163.   Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

164.   As a result of Defendants' breach of fiduciary duties, Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

165.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition,

Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

### COUNT II

**Failure to Adequately Monitor ERISA Fiduciaries**
**Imprudent and Unreasonable RK&A Fees**
**(On Behalf of Plaintiffs and the Class)**

166.  Plaintiffs incorporate the above allegations as if fully set forth herein.

167.  Defendants had the authority to appoint and remove individuals responsible for RK&A fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

168.  In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing RK&A fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

169.  Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

170.  Defendants breached their fiduciary duties by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for RK&A fees for the Plan or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RK&A fees and expenses;

    b.    Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate the availability of lower-cost recordkeepers;

c.   Failing to remove individuals responsible for overseeing and monitoring the Plan's RK&A service providers and fees, including those individuals responsible for maintaining Mass Mutual/Empower as recordkeeper at the current level of fees being paid to it, or altogether, which was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

171.   As the consequences of the foregoing fiduciary breaches, Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

172.   Pursuant to 29 U.S.C. § 1109(a) and § 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for RK&A fees for the Plan. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

C.   A Declaration that Defendants have breached their fiduciary duties under ERISA;

D.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control RK&A fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.   An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

- 39 -

F.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

G.    An award of pre-judgment interest;

H.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    Such other and further relief as the Court deems equitable and just.

## IX.    NOTICE PURSUANT TO ERISA SECTION 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint with redactions as approved by the Court, a true and correct copy of this Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: June 13, 2022

Respectfully submitted,

*/s/ Robert R. Ahdoot*
Robert R. Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Michael L. Roberts (*pro hac vice* to be filed)
**ROBERTS LAW FIRM**
*mikerobert@robertslawfirm.us*
1920 McKinney Avenue, Suite 700
Dallas, TX 75201

510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

Erich P. Schork (*pro hac vice* to be filed)
*erichschork@robertslawfirm.us*
**ROBERTS LAW FIRM**
PO Box 31909
Chicago, IL 60631-9998
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

*Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT