Cheryl D. Orr (SBN 143196)
cheryl.orr@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, California 94111
Telephone: 415.591.7500 | Facsimile: 415.591.7510

Sara Ehsani-Nia (SBN 326501)
sara.ehsaninia@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
1800 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: 310.203.4000 | Facsimile: 310.229.1285

Richard Pearl (pro hac vice motion filed)
rick.pearl@faegredrinker.com
Kimberly Jones (pro hac vice motion filed)
kimberly.jones@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
320 South Canal Street, Suite 3300
Chicago, Illinois 60606-5707
Telephone: 312.569.1000 | Facsimile:  312.569.3000

Emily A. Kile-Maxwell (pro hac vice motion pending)
emily.kilemaxwell@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
Telephone: 317.237.0300 | Facsimile:  317.237.1000

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| NICKOLAS TSUI and WILLIAM LUGO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSAL SERVICES OF AMERICA, LP, ALLIED UNIVERSAL TOPCO LLC, ALLIED UNIVERSAL BENEFITS COMMITTEE, and JOHN AND JANE DOES 1-10,<br><br>Defendants. | Case No. 8:22-cv-01158-JWH-JDE<br><br>Judge John W. Holcomb<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:        October 7, 2022<br>Time:       9:00 a.m.<br>Dept:        Courtroom 9D<br>Judge:      Hon. John W. Holcomb<br><br>Complaint Filed: June 13, 2022 |

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS

CASE NO. 8:22-CV-01158-JWH-JDE

1
2

# <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ................................................................. 1

II. STATEMENT OF FACTS .................................................. 3

III. ARGUMENT ..................................................................... 10

    A.    12(b)(6) Legal Standard ............................................ 10

    B.    Legal Framework for ERISA Duty of Prudence Claims ................... 11

        1.    The ERISA Duty of Prudence ................................ 11

        2.    ERISA Standards for Evaluating Recordkeeping Fees ........... 12

    C.    Count I Fails to State a Claim for Breach of the Duty of Prudence. ......... 15

        1.    Benchmarking Claims Require Truly Comparable Data. ........ 16

        2.    Plaintiffs' Benchmarking is Flawed and Does not Support a Claim. ... 18

    D.    Counts I and II Fail to State a Claim against Allied Universal. ......... 22

    E.    Plaintiffs Fail to State a Claim for Breach of the Duty to Monitor (Count II). ........ 23

IV. CONCLUSION .................................................................. 24

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS
- i -
CASE NO. 8:22-CV-01158-JWH-JDE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acosta v. Brain*,
910 F.3d 502 (9th Cir. 2018) ............................................................................... 22

*Alas v. AT&T Servs., Inc.*,
No. 2:17-cv-8106-VAP-RAOx, 2021 WL 4893372 (C.D. Cal. Sept.
28, 2021) .................................................................................................... 13, 14, 19

*Am. Bank v. City of Menasha*,
627 F.3d 261 (7th Cir. 2010) ............................................................................... 14

*Anderson v. Intel Corp. Investment Pol'y Comm.*,
--- F. Supp. 3d ---, 2022 WL 74002 (N.D. Cal. 2022) ........................... 12, 16, 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 3

*Beck v. Pace Int'l Union*,
551 U.S. 96 (2007) ............................................................................................... 22

*Cunningham v. USI Ins. Servs., LLC*,
No. 21 Civ. 1819 (NSR), 2022 WL 889164 (S.D.N.Y. Mar. 25,
2022) .................................................................................................................... 20

*Davis v. Salesforce.com, Inc.*,
2022 WL 1055557 (9th Cir. Apr. 8, 2022) .......................................................... 15

*Davis v. Washington Univ.*,
960 F.3d 478 (8th Cir. 2020) ............................................................................... 16

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.*,
920 F.2d 457 (7th Cir. 1990) ............................................................................... 12

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) ............................................................................... 22

*DM Rsch., Inc., v. Coll. Of Am. Pathologists*,
170 F.3d 53 (1st Cir. 1999) ................................................................................. 16

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS
- ii -
CASE NO. 8:22-CV-01158-JWH-JDE

*Donovan v. Mazzola*,
   716 F.2d 1226 (9th Cir. 1983) ............................................................. 12

*Donovan v. Walton*,
   609 F. Supp. 1221 (S.D. Fla. 1985), *aff'd sub nom. Brock v.
   Walton*, 794 F.2d 586 (11th Cir. 1986) ............................................. 10

*Dover v. Yangfeng US Auto. Interior Sys. I, LLC*,
   563 F. Supp. 3d 678 (E.D. Mich. 2021) .............................................. 19

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................ 14

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) .....................................................................*passim*

*Hecker v. Deere*,
   556 F.3d 575 (7th Cir. 2009) .............................................................. 13

*Howell v. Motorola, Inc.*,
   633 F.3d 552 (7th Cir. 2011) .............................................................. 23

*Hughes v. Nw. Univ.*,
   --- U.S. ---, 142 S. Ct. 737 (2022) ........................................... 11, 12, 13

*Kirschbaum v. Reliant Energy, Inc.*,
   526 F.3d 243 (5th Cir. 2008) .............................................................. 12

*Kong v. Trader Joe's Co.*,
   2022 WL 1125667 (9th Cir. Apr. 15, 2022) ........................................ 15

*Kurtz v. Vail Corp.*,
   511 F. Supp. 3d 1185 (D. Colo. 2021) ............................................... 14

*Marshall v. Northrup Gruman Corp.*,
   No. 2:16-cv-06794-AB, 2019 WL 4058583 (C.D. Cal. Aug. 14,
   2019) ................................................................................................... 14

*Martin v. CareerBuilder, LLC*,
   No. 19-cv-6463, 2020 WL 3578022 (N.D. Ill. July 1, 2020) ............... 17

*Mator v. WESCO Distrib., Inc.*,
   2022 WL 1046439 (W.D. Pa. Apr. 7, 2022) .......................... 13, 15, 17

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS                       - iii -                    CASE NO. 8:22-CV-01158-JWH-JDE

*Moitoso v. FMR LLC*,
No. CV 18-12122-WGY, 2020 WL 1495938 (D. Mass. Mar. 27,
2020) .................................................................................................. 12

*Pegram v. Herdrich*,
530 U.S. 211 (2000) ........................................................................... 22

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret.*
*Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 706 (2d Cir. 2013) ........................................... 12, 14, 15, 16

*Ramos v. Banner Health*,
461 F. Supp. 3d 1067 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir.
2021) .................................................................................................. 14

*Reichert v. Juniper Networks, Inc.*,
No. 21-cv-06213-JD, 2022 U.S. Dist. LEXIS 76599 (N.D. Cal.
Apr. 27, 2022) .................................................................................... 15

*Riley v. Olin Corp.*,
No. 4:21-cv-01328-SRC, 2022 WL 2208953 (E.D. Mo. June 21,
2022) .................................................................................................. 16

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
No. 3:15-cv-1839 (VAB), 2016 WL 7494320 (D. Conn. Dec. 30,
2016) .................................................................................................. 23

*Simonyan v. Ally Fin., Inc.*,
2013 WL 45453 (C.D. Cal. Jan. 3, 2013) .......................................... 16

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ....................................................*passim*

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ........................................................... 10

*Terraza v. Safeway Inc.*,
241 F. Supp. 3d 1057 (2017) ............................................................... 3

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015) ........................................................................... 15

*United States ex rel. Modglin v. DJO Global Inc.*,
48 F. Supp. 3d 1362 (C.D. Cal. 2014) ................................................. 4

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS

- iv -

CASE NO. 8:22-CV-01158-JWH-JDE

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) .................................................................... 11

*W. Mining Council v. Watt*,
    643 F.2d 618 (9th Cir. 1981) ....................................................... 10

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) ..................................................... 10

*Wehner v. Genentech, Inc.*,
    No. 20-cv-06894-WHO, 2021 WL 2417098 (N.D. Cal. June 14,
    2021) ......................................................................... 10, 17, 18, 21

*White v. Chevron Corp.*,
    No. 16-cv-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ... 10, 16, 23

*White v. Chevron Corp. ("White II")*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017) ........................... 16, 19

*Woznicki v. Aurora Health Care, Inc.*,
    No. 20-cv-1246-bhl, 2022 WL 1720093 (E.D. Wis. May 27, 2022) ..... 13, 17, 19

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x (2d Cir. 2009) ......................................................... 18

**STATUTES, RULES & REGULATIONS**

29 C.F.R. § 2550.404a-5 ...................................................................... 21

29 U.S.C. § 1001, *et seq.* (Employee Retirement Income Security Act
    of 1974)..................................................................................*passim*

29 U.S.C. § 1002(21)(A) ............................................................... 22, 23

29 U.S.C. § 1104(a)(1)(B) ............................................................. 11, 12

ERISA § 404(a) ...................................................................................... 11

ERISA § 404(a)(1)(A) .......................................................................... 15

ERISA § 404(a)(1)(B) ..................................................................... 15, 23

ERISA § 502(a)(2)............................................................................ 15, 23

ERISA § 502(a)(3)................................................................................ 15

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS            - v -            CASE NO. 8:22-CV-01158-JWH-JDE

Fed. R. Civ. P. 12(b)(6) .................................................................................. 10, 11

Fed. R. Evid. 201 ................................................................................................. 4

Improving Investment Advice for Workers & Retirees, 85 Fed. Reg.
    82798 (Dec. 18, 2020) .................................................................................. 20, 21

**OTHER AUTHORITIES**

120 Cong. Rec. 29,198 (1974), reprinted in 1974 U.S. Code Cong. &
    Admin. News 5167, and in 3 Legislative History 4673 ................................... 11

Form 5500 Search, DEP'T OF LABOR,
    https://www.efast.dol.gov/5500search/ ......................................................... 18

*Introduction to Investing Glossary, Distribution [and/or Service] 12b-
    1 Fees*, INVESTOR.GOV, U.S. SECS. & EXCH. COMM., *available at*
    https://www.investor.gov/introduction-investing/investing-
    basics/glossary/distribution-andor-service-12b-1-fees ...................................... 5

IRS, Department of Labor, and Pension Benefit Guaranty Corporation
    Instructions for Form 5500, Annual Return/Report of Employee
    Benefit Plan, *available at*
    https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-
    advisers/plan-administration-and-compliance/reporting-and-
    filing/form-5500/2021-instructions.pdf ............................................................. 4

New Fiduciary Advice Exemption: PTE 2020-02 Improving
    Investment Advice for Workers & Retirees Frequently Asked
    Questions, U.S. DEP'T OF LABOR, *available at*
    https://www.dol.gov/agencies/ebsa/about-ebsa/our-
    activities/resource-center/faqs/new-fiduciary-advice-exemption
    (Apr. 2021) ........................................................................................................ 21

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS

- vi -

CASE NO. 8:22-CV-01158-JWH-JDE

# I.
# INTRODUCTION

Plaintiffs' ERISA[1] claims in this case challenge the Defendants' *conduct* in approving the amount the Allied Universal 401(k) Plan ("Plan") paid for "recordkeeping" fees. Under ERISA, those who act on a plan's behalf in retaining a recordkeeper have a fiduciary duty to ensure that its fee is reasonable, in view of the actual services provided, the quality of those services, and the needs of the particular plan and its participant base. An ERISA fiduciary who acts prudently in selecting a recordkeeper, for a reasonable (not necessarily the lowest) fee in view of all of the facts and circumstances, complies with its fiduciary obligations.

As one could imagine, there is a universe of potentially reasonable recordkeeping arrangements and fees that a prudent ERISA fiduciary might select for a plan. No two plans are the same; they vary in terms of number of participants, total assets, participant sophistication and needs of the participant base, investment offerings, average account balance, average age of participants, and other factors. No two recordkeepers are the same; they vary in terms of things like the availability of their phone services, design and implementation of mobile applications, on-site visits, cybersecurity, available education and information, and even the personalities of key individuals that service a particular plan. Although a plan's fiduciaries might be able to cut costs by, for example, scouring the market for a cheaper recordkeeper, or cutting services or contracting with less reliable vendors, that is not what ERISA requires. ERISA entitles a plan's fiduciaries to select a reasonable arrangement for their plan.

Applying just these few principles discussed above is all that is required to reveal the significant deficiencies in Plaintiffs' claims. Rather than allege facts about Defendants' conduct in approving the recordkeeper, or specifics about the recordkeeping services and quality of those services that the Plan received,

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS          - 1 -          CASE NO. 8:22-CV-01158-JWH-JDE

1  Plaintiffs base their claims on nothing but a purported comparison between the

2  Plan's recordkeeping fees and recordkeeping fees of a cherry-picked handful of

3  other defined-contribution plans. Plaintiffs allege that based on this superficial

4  comparison, the Plan paid higher fees than the supposed comparator plans, and thus

5  this Court should infer that the Defendants' process in approving the Plan's

6  recordkeeping arrangement was flawed.

7       But, as set forth below, the comparison Plaintiffs allege they performed does

8  not support the allegation that the Plan's fees were unreasonable. In order to give

9  rise to an inference of imprudence, Plaintiffs must present truly comparable data

10  that indicates that the Plan's fees may have been unreasonably high. Here, of the

11  approximately 600,000 401(k) plans in the U.S., Plaintiffs cherrypicked only eight,

12  and only one year of data. The eight plans that Plaintiffs chose are not comparable

13  to the Plan for several reasons: ***first***, the comparator plans had significantly more

14  assets than the Plan – in fact, one of the alleged comparators had nearly ***20-times***

15  the assets that the Plan had in 2018 (ECF No. 1 ("Compl.") ¶ 113); ***second***,

16  Plaintiffs made a grave error when they relied on fees that each plan reported on

17  publicly filed Form 5500s, because the Form 5500 data shows that each plan

18  reported receiving different services for the fees it paid; ***third***, the fees that each

19  plan reported on its Form 5500 included fees that individual participants paid for

20  individualized services, and such fees are not charged to a plan or other

21  participants; and ***fourth***, Plaintiffs arbitrarily increased the Plan's fees by adding

22  some estimate of "indirect" fees that Plaintiffs speculate the Plan's recordkeeper

23  may have received – Plaintiffs did not, however, also increase the comparators' fees

24  by a similar estimate.

25       Plaintiffs' prototypical apples-to-oranges comparison does not give rise to an

26  inference of imprudent conduct. The Complaint fails to state a claim and should be

27  dismissed.

28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS                    - 2 -        CASE NO. 8:22-CV-01158-JWH-JDE

## II.
## STATEMENT OF FACTS[2]

### *Parties and the Plan*

Notably, the 172-paragraph, 42-page Complaint has only *34* paragraphs that relate to the management of this specific Plan. Compl. ¶¶ 98-133. And of those 34, almost all are (1) conclusory; (2) legal conclusions couched as factual allegations; or (3) factually inaccurate as compared to the very documents Plaintiffs cite for them. Plaintiffs cannot create the law that they want this Court to apply to their claims, nor can they rely on mischaracterizations of documents.

According to the Complaint's *factual*, as opposed to legal, argumentative, and conclusory allegations, the Plan is an ERISA-governed, defined-contribution plan sponsored by Defendant Universal Services of America ("Universal Services" or "Plan Sponsor") and administered by Defendant the Allied Universal Benefits Committee (or "Plan Administrator").[3] Compl. ¶¶ 44, 48-50. The Plan allegedly covers eligible employees of Defendant Allied Universal Topco LLC and its affiliates ("Allied Universal," and together with Universal Services, "Allied Defendants"). *Id.*, ¶ 51. Plaintiffs Nickolas Tsui and William Lugo are participants with vested account balances in the Plan (since 2018 and 2015, respectively). *Id.*, ¶¶ 27, 34.

In a defined-contribution 401(k) plan, participants may select investment options "from an investment lineup selected by the Plan's fiduciaries." *Id.*, ¶ 50. The plan sponsor may also make contributions to certain eligible accounts. *Id.* To

---

[2]  Unless otherwise stated, Defendants base these facts on the allegations in the Complaint, which are presumed true solely for purposes of this Motion. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When allegations in the Complaint contradict documents attached to or incorporated by reference in the Complaint, though, those documents control. *See, e.g.*, *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057 (2017).

[3]  The Plan's annual Form 5500s identify Universal Services as the Plan Administrator. Compl. ¶ 44. Defendants do not dispute that the Plan's Summary Plan Description separately identifies the Committee as the Plan Administrator or that the Committee is, in fact, the Plan Administrator. *Id.*; *see also* ECF No. 19 at 3.

help administer a plan, the plan's recordkeeper serves as the plan's hub for

participant documentation and information. The recordkeeper may provide plan-

wide services (i.e. for all participants) like "maintaining plan records, tracking

participant account balances and investment elections, providing transaction

processing, providing call center support and investment education and guidance,

providing participant communications, and providing trust and custodial services."

*Id.*, ¶ 58. Recordkeepers may also provide participant-specific services, like "loan

initiation and maintenance," for which they charge participants individually. *Id.*,

¶ 60. The Plan's recordkeeper for the period covered by the Complaint has been

Massachusetts Mutual Life Insurance Company ("Mass Mutual"). *Id.*, ¶ 30.[4]

***Alleged Misconduct***

Plaintiffs allege that the Defendants caused the Plan to pay excessive

recordkeeping and administrative expenses to Mass Mutual. *Id.*, ¶¶ 17-20.

In particular, the Complaint alleges that the Plan paid between $78 and $119 per

participant for recordkeeping services between 2018 and 2019, and that these

amounts were excessive compared to the fees that eight other plans paid for their

recordkeeping services. *Id.*, ¶ 104.

To conduct this comparison, Plaintiffs allege that they calculated the Plan's

average fee per-participant. To do this, Plaintiffs reviewed annual, public filings the

Plan was required to make each year with the IRS, called the "Form 5500."[5] In a

---

[4]   In 2021, Empower purchased Mass Mutual's retirement plan business. *Id.*, ¶ 30 n.5. Defendants refer to Mass Mutual and Empower collectively as "Mass Mutual" throughout this Motion.

[5]   *See* Kile-Maxwell Decl. Ex. 6 at 8, 13, 26, 28 (IRS, Department of Labor, and Pension Benefit Guaranty Corporation Instructions for Form 5500, Annual Return/Report of Employee Benefit Plan), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500-2021-instructions.pdf. The Court may take judicial notice of these government agencies' public guidance regarding compliance with their regulations pursuant to Fed. R. Evid. 201. *See United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1381-82 (C.D. Cal. 2014) (taking judicial notice of documents and guidance on FDA, SEC, and Centers for Medicare & Medicaid Services websites).

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS                    - 4 -         CASE NO. 8:22-CV-01158-JWH-JDE

Form 5500, a plan is required to disclose certain information, including the total number of active participants at the beginning and end of the year, and something called the "<u>total</u> direct compensation" paid to all service providers who receive more than $5,000 in compensation each year from the Plan. Plaintiffs took the "total direct compensation" reportedly paid to Mass Mutual, and then added some supposed "estimate" of other "indirect" compensation that Plaintiffs allege Mass Mutual might have received. Compl. ¶ 104. The Plan's Form 5500s do not (and are not required to) disclose the amount of indirect compensation that Mass Mutual might have received, and Plaintiffs do not allege how they derived their estimate of indirect compensation.

"Indirect compensation" is, however, compensation that a service provider "received in connection with services rendered to the plan during the plan year" but "from sources other than directly from the plan or plan sponsor." Decl. of Emily Kile-Maxwell ("Kile-Maxwell Decl."), Ex. 6 at 26-27. For example, an investment fund manager may compensate a plan's recordkeeper for marketing the fund and making it available to a plan's participants (referred to as "12b-1 fees"). *See id.* at 27 (giving examples of indirect compensation).[6] Plaintiffs concede that indirect compensation results from "separate contractual arrangements with mutual fund providers." Compl. ¶ 69.

After adding the total direct compensation reported on the Form 5500s and some estimate of supposed "indirect" compensation, Plaintiffs' approach was to divide that by the number of active participants at the end of each year. This resulted in the alleged average fee that the Plan allegedly paid to Mass Mutual, on a per-participant basis.

---

[6]  *See also Introduction to Investing Glossary, Distribution [and/or Service] 12b-1 Fees*, INVESTOR.GOV, U.S. SECS. & EXCH. COMM., *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/distribution-andor-service-12b-1-fees (explaining 12b-1 fees).

The Form 5500 data for the Plan is set forth in the tables below. The first table shows the number of participants and net plan assets at each relevant year's end:[7]

| | Participants with Account Balances at End of Plan Year | Net Assets in Plan at End of Plan Year |
|---|---|---|
| 2016 | 3,739 | $59,183,693[8] |
| 2017 | 10,905 | $176,182,436[9] |
| 2018 | 10,922 | $166,885,831[10] |
| 2019 | 13,115 | $208,548,932[11] |
| 2020 | 17,513 | $276,875,951[12] |

The next table below shows the Plan's reported <u>total</u> direct compensation to Mass Mutual for all services Mass Mutual provided to the Plan in each year.

| | Total Direct Compensation Reported | Services Reported as Provided by Mass Mutual |
|---|---|---|
| 2016[13] | $189,105 | Investment management fees paid indirectly by plan; sub-transfer agency fees; distribution (12b-1) fees; recordkeeping fees; and other investment fees and expenses |
| 2017[14] | $342,312 | Investment management fees paid indirectly by plan; sub-transfer agency fees; distribution (12b-1) fees; recordkeeping fees; other investment fees and expenses |
| 2018[15] | $1,197,051 | Other services; investment management fees paid indirectly by plan; sub-transfer agency fees; distribution (12b-1) fees; recordkeeping fees; other investment fees and expenses |

---

[7]  These figures are taken in part from the Complaint, ¶ 104, supplemented with publicly available information from the Plan's Form 5500s that are referenced in and central to the allegations in the Complaint. The Court may consider these documents for purposes of Defendants' Motion to Dismiss. *See infra* Section III.A. Form 5500s for Plan years 2021 and 2022 are not yet available.

[8]  Kile-Maxwell Decl. Ex. 1 at 2, (Plan's 2016 Form 5500); *id.* Sch. H at 2.

[9]  Kile-Maxwell Decl. Ex. 2 at 2 (Plan's 2017 Form 5500); *id.* Sch. H at 2.

[10]  Kile-Maxwell Decl. Ex. 3 at 2 (Plan's 2018 Form 5500); *id.* Sch. H at 2.

[11]  Kile-Maxwell Decl. Ex. 4 at 2 (Plan's 2019 Form 5500); *id.* Sch. H at 2.

[12]  Kile-Maxwell Decl. Ex. 5 at 2 (Plan's 2020 Form 5500); *id.* Sch. H at 2.

[13]  Kile-Maxwell Decl. Ex. 1 Sch. C at 3-1.

[14]  Kile-Maxwell Decl. Ex. 2 Sch. C at 3-1.

[15]  Kile-Maxwell Decl. Ex. 3 Sch. C at 3-1.

| | | |
|---|---|---|
| 2019[16] | $1,360,998 | Other services; investment management fees paid indirectly by plan; sub-transfer agency fees; float revenue; recordkeeping fees; other investment fees and expenses |
| 2020[17] | $1,374,620 | Investment management fees paid indirectly by plan; sub-transfer agency fees; float revenue; distribution (12b-1) fees; recordkeeping fees; other investment fees and expenses |

Note that the last column, entitled "Services Reported as Provided by Mass Mutual," reflects information obtained from "service codes" the Plan provided on the Form 5500. Service codes are addressed in the Form 5500's instructions, and the service codes "describe … the kind of service provided" by each service provider disclosed on the Form 5500. Kile-Maxwell Decl. at 28-29.

Also note that the "total direct compensation" listed on a Form 5500 will include any payments for services the recordkeeper provided to an individual participant, on a fee-for-service basis charged to that participant only, as opposed to services provided on a plan-wide basis. *Id.* at 26. Thus, in calculating the average per-participant fee that the Plan paid to Mass Mutual, Plaintiffs included: (1) the total direct compensation listed on the Plan's Form 5500, without regard to what portion of that may have been paid on an individual-participant level; (2) Plaintiffs' estimate of supposed "indirect compensation" that they speculate Mass Mutual *may have* received indirectly from third parties other than the Plan; and (3) the total number of active Plan participants at the end of each relevant year.

### The Alleged Comparator Plans

Plaintiffs allege that the Plan paid more in recordkeeping fees than eight other plans identified in the Complaint ("Comparator Plans"). It is unclear why Plaintiffs chose these eight; there are more than 600,000 401(k) plans in the country. To calculate the Comparator Plans' fees, Plaintiffs began with the total direct compensation disclosed on those plans' Form 5500 reports as paid to their

---

[16]   Kile-Maxwell Decl. Ex. 4 Sch. C at 3-1.
[17]   Kile-Maxwell Decl. Ex. 5 Sch. C at 3-1.

recordkeepers. But, *unlike Plaintiffs' calculation of the Plan's fees*, Plaintiffs do not allege that they added an estimate of supposed "indirect" compensation that the Comparator Plans' service providers may have received.

The Comparator Plans' Form 5500s also used service codes to describe the services that the Comparator Plans received – but the services that the Comparator Plans reported receiving from their recordkeepers *are not the same* as the services the Plan reported receiving from Mass Mutual. For example, the following table shows the total direct compensation the Comparator Plans paid for the specific services that were identified in the Form 5500s by service codes:

| Total Direct Compensation Reported for "Recordkeeping" Services | | Services Reported as Provided |
|---|---|---|
| Centerpoint Energy Savings Plan[18] | $346,431[19] | Recordkeeping fees (paid to **Voya Institutional Plan Services**) |
| Flowers Foods, Inc. 401(k) Retirement Savings Plan[20] | $532,282 | Recordkeeping and information management (computing, tabulating, data processing, etc.); recordkeeping fees (paid to **Great-West Life & Annuity Insurance**) |
| Fortive Retirement Savings Plan[21] | $472,673 | Participant loan processing; recordkeeping fees; account maintenance fees; securities brokerage commissions and fees (paid to **Fidelity Investments Institutional**) |
| Michelin Retirement Account Plan[22] | $425,270 | Recordkeeping and information management (computing, tabulating, data processing, etc.); consulting (general); trustee (directed); investment management fees paid indirectly by plan (paid to **The Vanguard Group, Inc.**) |
| Republic National 401(k) Plan[23] | $324,171 | Recordkeeping and information management (computing, tabulating, data processing, etc.); participant loan processing; direct payment from the plan; recordkeeping fees (paid to **Great-West Life & Annuity Insurance**) |

---

[18]  Kile-Maxwell Decl. Ex. 7 Sch. C at 3-1.

[19]  Plaintiffs appear to have incorrectly reported this amount in the Complaint. *See* Compl. ¶ 113.

[20]  Kile-Maxwell Decl. Ex. 8 Sch. C at 3-1.

[21]  Kile-Maxwell Decl. Ex. 9 Sch. C at 3-1.

[22]  Kile-Maxwell Decl. Ex. 10 Sch. C at 3-1.

[23]  Kile-Maxwell Decl. Ex. 11 Sch. C at 3-1.

| Southern California Permanente Medical Group Tax Savings Retirement Plan[24] | $333,038 | Recordkeeping and information management (computing, tabulating, data processing, etc.); trustee (directed); investment advisory (participants); participant loan processing; participant communication; investment management fees paid indirectly by plan (paid to **The Vanguard Group, Inc.**) |
|---|---|---|
| Sutter Health Retirement Income Plan[25] | $460,727 | Sub-transfer agency fees; recordkeeping fees; distribution (12b-1) fees (paid to **Fidelity Investments Institutional**) |
| Viacom 401(k) Plan[26] | $376,314 | Recordkeeping and information management (computing, tabulating, data processing, etc.); participant loan processing; direct payment from the plan; recordkeeping fees (paid to **Great-West Life & Annuity Insurance**) |

To calculate the average, per-participant fee the Comparator Plans allegedly paid for recordkeeping services, Plaintiffs divided the reported total direct compensation – without adding estimated indirect compensation – by the number of participants at each year's end.

None of the "comparable" plans had Mass Mutual as their recordkeeper. Nor did they use the same service codes as the Plan used to describe the services that the Plan received from Mass Mutual as the Plan's recordkeeper. Plaintiffs do, however, allege without factual support that the services the Comparator Plans received were "materially identical" to the services the Plan received from Mass Mutual. Compl. ¶ 114. Plaintiffs allege that the Plan paid more in recordkeeping fees than the Comparator Plans, and Plaintiffs then "infer" from that allegation that Defendants "failed to follow a prudent process to ensure that the Plan was paying only reasonable fees." Compl. ¶ 130. Plaintiffs allege no facts about any such processes other than that, "[u]pon information and belief," Defendants "did not regularly and/or reasonably assess the RK&A fees paid to Mass Mutual" and "did not engage in any regular and/or reasonable examination and competitive comparison of the

---

[24] Kile-Maxwell Decl. Ex. 12 Sch. C at 3-1.
[25] Kile-Maxwell Decl. Ex. 13 Sch. C at 3-1.
[26] Kile-Maxwell Decl. Ex. 14 Sch. C at 3-1.

RK&A fees it paid to Mass Mutual/Empower vis-à-vis the fees that other providers would charge for the same services." *Id.*, ¶ 124.

## III.
## ARGUMENT

### A.    12(b)(6) Legal Standard

A complaint must be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) "if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory." *White v. Chevron Corp.* ("*White I*"), No. 16-cv-0793-PJH, 2016 WL 4502808, at *3 (N.D. Cal. Aug. 29, 2016). Although the Court must "accept as true all the factual allegations in the complaint," it need not accept "legally conclusory statements, not supported by actual factual allegations." *Id.* The Court's review is "generally limited to the contents of the complaint," but it may also "consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document." *Id.* (considering Form 5500 documents); *Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 2417098 (N.D. Cal. June 14, 2021). The Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (first quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); then quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

The Rule 12(b)(6) motion is particularly important in the ERISA space. In enacting ERISA, Congress expressed concern with potential litigation costs and administrative burdens that might discourage the formation of plans or competent fiduciaries from serving. *See, e.g.*, *Donovan v. Walton*, 609 F. Supp. 1221, 1231 (S.D. Fla. 1985), *aff'd sub nom. Brock v. Walton*, 794 F.2d 586 (11th Cir. 1986). "Courts may have to take account of competing congressional purposes," including

Congress' "desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ... benefit plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996).[27] The Supreme Court has therefore recognized that Rule 12(b)(6) motions to dismiss are an "important mechanism for weeding out meritless claims" and "divid[ing] the plausible sheep from the meritless goats" in cases alleging that ERISA fiduciaries acted imprudently. On a Rule 12(b)(6) motion, a district court evaluating ERISA fiduciary-breach claims is required to conduct a "***careful, context-sensitive scrutiny*** of a complaint's allegations." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (emphasis added); *see also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164 (6th Cir. 2022). The Supreme Court recently reiterated the importance of a fulsome review of an ERISA complaint's allegations, observing that "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," and instructing that "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, --- U.S. ---, 142 S. Ct. 737, 742 (2022).

**B.    <u>Legal Framework for ERISA Duty of Prudence Claims</u>**

**1.    The ERISA Duty of Prudence**

ERISA regulates benefit plans largely by regulating the conduct of those who make final, discretionary decisions about the plan or plan assets. Pursuant to ERISA § 404(a), fiduciaries are required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Section 404(a)'s focus on

---

[27] *See also* 120 Cong. Rec. 29,198 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 5167, and in 3 Legislative History 4673 (statement of Rep. Ullman, Senior House Manager on the Conference Committee, while introducing the Conference Report: "plans cannot be expected to develop if costs are made overly burdensome, particularly for employers who generally foot most of the bill").

"the circumstances then prevailing" means the scope of the duty of prudence is highly "context specific." *Fifth Third Bancorp*, 573 U.S. at 425; 29 U.S.C. § 1104(a)(1)(B) (emphasis added).

This general "duty of prudence" is judged by an objective standard that examines "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of" a given decision. *Anderson v. Intel Corp. Investment Pol'y Comm.*, --- F. Supp. 3d ---, 2022 WL 74002, at *8 (N.D. Cal. 2022) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)). The prudence requirement is "a flexible standard." *Kirschbaum v. Reliant Energy, Inc*., 526 F.3d 243, 253–54 (5th Cir. 2008). "*There is no exact, 'uniform checklist' that a prudent fiduciary must follow.*" *Moitoso v. FMR LLC*, No. CV 18-12122-WGY, 2020 WL 1495938, at *7 (D. Mass. Mar. 27, 2020) (emphasis added); *CommonSpirit*, 37 F.4th at 1162 (ERISA "does not give the federal courts a broad license to second-guess the investment decisions of retirement plans."). Therefore, "the Court's focus is on the fiduciary's 'conduct in arriving at a decision, *not on its results*.'" *Anderson*, 2022 WL 74002 at *8 (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 706, 716 (2d Cir. 2013)) (emphasis added). The Court must "judge a fiduciary's actions based upon information available to the fiduciary at the time … not from the vantage point of hindsight." *St. Vincent*, 712 F.3d at 716 (citation omitted). ERISA "requires prudence, not prescience." *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (citation omitted).

## 2.    ERISA Standards for Evaluating Recordkeeping Fees

Where, as here, ERISA claims challenge fiduciary decisions in approving recordkeeping arrangements for a 401(k) plan, the "tradeoffs" identified by the Supreme Court in *Hughes*, 142 S. Ct. at 742, and the "context-specific" inquiry required by *Dudenhoeffer*, implicate some important considerations. These plans

are subject to a host of regulatory and administrative requirements imposed by the Department of Labor ("DOL") and Internal Revenue Service ("IRS"). Plans rely on recordkeepers to help with this regulatory framework. *Woznicki v. Aurora Health Care, Inc.*, No. 20-cv-1246-bhl, 2022 WL 1720093, at *1 (E.D. Wis. May 27, 2022). To pay for the necessary and beneficial recordkeeping services, some costs are allocated back to participants in the form of various fees referred to generically as "recordkeeping fees," although that can be a misnomer because these "recordkeepers" can provide a variety of services to some plans.

For example, recordkeepers may "help plans track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants." *Hughes*, 142 S. Ct. at 740. Others provide services related to "loan transaction[s], cash dividend processing and mailing documents." *Alas v. AT&T Servs., Inc.*, No. 2:17-cv-8106-VAP-RAOx, 2021 WL 4893372 (C.D. Cal. Sept. 28, 2021). Others still may provide "Internet access to accounts, … retirement education services, … telephone support to answer questions or give assistance to Plan participants, and a brokerage window to enable Plan participants to invest in securities outside the Plan." *Mator v. WESCO Distrib., Inc.*, 2022 WL 1046439 (W.D. Pa. Apr. 7, 2022).

There are different ways to pay recordkeeping fees. Some fees are typically paid on a per-participant basis or are calculated "as a percentage of the assets for which the recordkeeper is responsible." *Hughes*, 142 S. Ct. at 740. Others are individually charged to participants for specific services those participants utilize. Compl. ¶ 60. Although Plaintiffs seem to think that plan administrators must always seek out the cheapest services, ERISA and courts recognize that cheaper is not the standard of fiduciary prudence and, what is more, cheaper is not always better. "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible [services] (which might, of course, be plagued by other problems)." *Hecker v. Deere*, 556 F.3d 575, 586 (7th Cir. 2009). What ERISA *does*

require is that fiduciaries act "'with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use' in monitoring a plan's recordkeeping and other administrative expenses." *Alas*, 2021 WL 4893372 at *7 (quoting *Marshall v. Northrup Grumman Corp.*, No. 2:16-cv-06794-AB (JCx), 2019 WL 4058583, at *8 (C.D. Cal. Aug. 14, 2019)). But ERISA "*does not* give the federal courts a broad license to second-guess the investment decisions of retirement plans." *CommonSpirit*, 37 F.4th at 1162 (emphasis added).

At the pleading stage, Plaintiffs who challenge recordkeeping fees must allege facts to allow a court to infer that "no reasonable fiduciary" would have done as the defendants did. *See, e.g.*, *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1196 (D. Colo. 2021); *see also Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1129 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) (standard is "no prudent fiduciary" would have made the decision); *St. Vincent*, 712 F.3d at 720 ("[F]or a plaintiff relying on inferences from circumstantial allegations, this standard generally requires . . . facts, accepted as true, showing that a prudent fiduciary in like circumstances would have acted differently."). Courts have a duty to assess the sufficiency of these allegations at the pleading stage "in order to 'divide the plausible sheep from the meritless goats.'" *CommonSpirit*, 37 F.4th at 1164-65 (quoting *Fifth Third Bancorp*, 573 U.S. at 425).[28]

---

[28] This is in part because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times." *St. Vincent*, 712 F.3d at 719. That burden is "sometimes appropriate," but more often it "elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Rigorous analysis of the complaint "help[s] 'to prevent settlement extortion—using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit.'" *Id.* (quoting *Am. Bank v. City of Menasha*, 627 F.3d 261, 266 (7th Cir. 2010)).

Plaintiffs generally attempt to satisfy these pleading standards in one of three ways. First, they may allege *actual facts* about a fiduciary's *actual conduct* in selecting and monitoring a recordkeeper. *See, e.g.*, *St. Vincent*, 712 F.3d at 720-21. Second, they may pair their recordkeeping claim with a claim that the fiduciary acted imprudently in selecting and monitoring the plans' investment options. *See, e.g.*, *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). If a plaintiff "plausibly alleges a failure to provide cost-effective investments with reasonable fees," then a complaint's factual allegations may lend more support to recordkeeping claims, as well. *Kong v. Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022); *see also Davis v. Salesforce.com, Inc.*, 2022 WL 1055557 (9th Cir. Apr. 8, 2022); *Reichert v. Juniper Networks, Inc.*, No. 21-cv-06213-JD, 2022 U.S. Dist. LEXIS 76599 (N.D. Cal. Apr. 27, 2022). Third, plaintiffs may present a "benchmarking" claim, which is a comparison of the amount of recordkeeping fees they contend the defendant plan paid to what other allegedly comparable plans paid for allegedly identical services. *See, e.g.*, *Mator*, No. 2:21-cv-00403-MJH, 2022 WL 1046439, at *6-7 (W.D. Pa. Apr. 8, 2022).

**C.**     **Count I Fails to State a Claim for Breach of the Duty of Prudence.**

Count I is a claim pursuant to ERISA §§ 502(a)(2) and (a)(3) against all Defendants for alleged breaches of ERISA's duty of prudence and loyalty in §§ 404(a)(1)(A) and (B). Compl. ¶¶ 157-58. 162, 163, 165. As discussed above, the Complaint does not contain a claim for imprudent investment options. It also does not contain alleged facts about the Defendants' process. There are only conclusory allegations and allegations on information and belief without factual support, such as "Defendants imprudently failed to monitor and control the compensation paid by the Plan for RK&A services received by the Plan's recordkeeper," and "[u]pon information and belief, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees being paid to Mass Mutual" or "engage in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to

Mass Mutual/Empower vis-à-vis the fees that other providers would charge for the same services." Compl. ¶¶ 124, 127.

These unsupported allegations do not state a claim. *Riley v. Olin Corp.*, No. 4:21-cv-01328-SRC, 2022 WL 2208953 at *5 (E.D. Mo. June 21, 2022) (any allegation that Defendants "were required to solicit competitive bids on a regular basis has no legal foundation") (quoting *White I*, 2016 WL 4502808 at *14); *see also White v. Chevron Corp. ("White II")*, 2017 WL 2352137 (N.D. Cal. May 31, 2017) (their conclusory allegations are "little more than guesses," and "are a danger sign that [Plaintiffs are] engaged in a fishing expedition"); *St. Vincent*, 712 F.3d at 719 (quoting *DM Rsch., Inc., v. Coll. Of Am. Pathologists*, 170 F.3d 53, 55 (1ˢᵗ Cir. 1999)); *White I*, 2016 WL 4502808 at *6 (rejecting conclusory allegations that Defendants "failed to weigh the benefits of a stable value fund compared to the Vanguard Prime Money Market Fund"); *Simonyan v. Ally Fin., Inc.*, 2013 WL 45453 at *2 (C.D. Cal. Jan. 3, 2013) (holding that "information and belief" allegations that "contain nothing more than a rote recitation of the required elements of each respective claim" fail to state a plausible claim).

Plaintiffs attempt to state a claim using benchmarking data fails, as well.

### 1.    Benchmarking Claims Require Truly Comparable Data.

At the pleading stage, Plaintiffs who seek to rely on comparisons to state a fiduciary-breach claim are obligated to present reliable benchmarks, because "[w]ithout finding a *meaningful* benchmark, the Court cannot evaluate if an allegation of a violation of the duty of prudence is plausible; a plaintiff's comparison of 'apples to oranges is not a way to show that one is better or worse than the other.'" *Anderson*, 2022 WL 74002 at *14 (quoting *Davis v. Washington Univ.*, 960 F.3d 478, 485 (8th Cir. 2020)). Courts regularly "consider[] the question of whether a meaningful benchmark has been pled at the motion to dismiss stage," and the Court is not bound to accept conclusory labeling of other plans'

recordkeeping and administrative expenses as "comparable." *Anderson*, 2022 WL 74002 at *8, 14.

More to the point, to plead truly comparable plans for purposes of stating a claim for fiduciary imprudence, Plaintiffs must identify comparators that are: (1) similar in terms of number of participants; (2) similar in terms of total assets in the plans; (3) involve *the same service provider*; and (4) involve *the same services*. *See Wehner*, No. 20-cv-06894-WHO (N.D. Cal. June 14, 2021) (finding excessive recordkeeping claim plausible only when plaintiffs identified comparator plan of near-identical size (number of participants and assets) that retained identical recordkeeper providing identical services).

The reasons why courts require similarity in these particular characteristics is because these characteristics have material impacts on the recordkeeping fees that plans pay. Larger plans, for example, have more "leverage to negotiate smaller fees" with service providers, like recordkeepers. *Martin v. CareerBuilder, LLC*, No. 19-cv-6463, 2020 WL 3578022, at *4 n.6 (N.D. Ill. July 1, 2020); *see also Woznicki*, 2022 WL 1720093, at *4 (E.D. Wis. May 27, 2022) (rejecting attempt to compare plans with "significantly smaller number of participants" as "disingenuous"). Plaintiffs also should make a comparison between fees paid by other plans for Mass Mutual specifically, and not other recordkeepers whose services and quality are not comparable. *See Wehner*, 2021 WL 2417098 at *5 (rejecting as comparators any plans that engaged a different recordkeeper than the defendant plan). This is because recordkeeping fees vary based on "the '*specific* services the recordkeeper provided to the *specific plan* at issue.'" *Wehner*, 2021 WL 2417098 at *5.

A mere "price tag to price tag comparison" does not carry conclusory allegations of imprudence across the threshold "from possible to the plausible." *Mator*, 2022 WL 1046439 at *7. A comparison based on raw numbers alone will not suffice, because the question is whether "fees were excessive ***relative to the***

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS

- 17 -

CASE NO. 8:22-CV-01158-JWH-JDE

*services rendered*" to the Plan. *CommonSpirit*, 37 F.4th at 1169 (emphasis added) (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x (2d Cir. 2009) at 33). Plaintiffs have to allege more than just a comparison between "the common types of RK&A services that service providers typically perform for retirement plans." *Wehner*, 2021 WL 2417098 at *5.

### 2.    Plaintiffs' Benchmarking is Flawed and Does not Support a Claim.

Here, Plaintiffs allege that "the amounts remitted to Mass Mutual/Empower throughout the Class Period" were greater than "fees paid by other large plans receiving materially identical recordkeeping and administrative services, some of which used the same service provider as the Plan," to support their inference that the Defendants *must have* engaged in an imprudent decision-making process. Compl. ¶ 130. This comparison is flawed for several reasons. ***First***, in 2016, the Plan had *just 3,739 participants* with account balances, one-third to one-quarter the number of participants in the Comparator Plans in 2018.[29] Under the precedent discussed above, this factor alone renders the comparison unreliable.

***Second***, the *Plan's assets* pale in comparison to the assets in the Comparator Plans. The smallest Comparator Plan Plaintiffs identified is the Sutter Health Retirement Income Plan, which, in 2018, held *more than double* the amount of assets (over $400 million) than the Plan did in the same year (a mere $177 million). Compl. ¶ 113. One of the comparators had more than $2 billion in assets, which is more than 20x more than the Plan. *Id.* This also makes the comparisons unreliable.

***Third***, none of the Comparator Plans engaged Mass Mutual, nor did they report receiving the same services that the Plan reported receiving from Mass

---

[29]  *Compare* Kile-Maxwell Decl. Ex. 1 at 2 with Compl. ¶ 113. Plaintiffs tellingly did not disclose the number of participants in each of the Comparator Plans for the year 2016. That data is, of course, publicly available through the DOL, *see* Form 5500 Search, DEP'T OF LABOR, https://www.efast.dol.gov/5500search/, and reveals that although the number of participants in the Plan skyrocketed from 3,739 in 2016 to 10,905 in 2017, the number of participants in Plaintiffs' chosen comparators stayed relatively constant between 2016 and 2020.

Mutual. Compl. ¶ 113. The Form 5500 discloses that the Plan paid Mass Mutual for services *other than recordkeeping*, and Plaintiffs' calculation of Mass Mutual's compensation necessarily includes compensation for those services, too. *See Woznicki*, 2022 WL 1720093 at *3 (rejecting similar "back-of-the-napkin math" because it "includes fees other than recordkeeping, so using it as the dividend artificially inflates the recordkeeping fee"). So, too, for the Comparator Plans, whose service codes show that they paid some of their "recordkeepers" for "securities brokerage commissions and fees," "trustee" services, and general (unspecified) "consulting" services. *See, e.g.*, *White II*, 2017 WL 2352137 at *18 (rejecting comparator data when source data "include[d] a number of other fees paid to [recordkeeper] that are unrelated to recordkeeping" and plaintiffs did not "know what portion of the total fees actually relate to recordkeeping"); *CommonSpirit*, 37 F.4th at 1169 (affirming dismissal of complaint when plaintiff had "not pleaded that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites"). "Factually inaccurate allegations are not plausible allegations" for purposes of evaluating a claim of "improperly high recordkeeping fees." *Dover v. Yangfeng US Auto. Interior Sys. I, LLC*, 563 F. Supp. 3d 678, 689 (E.D. Mich. 2021). Plaintiffs' conclusion that the Comparator Plans received "materially identical services," Compl. ¶ 114, is just that: a factually inaccurate allegation that is implausible.

To be sure, the Form 5500 data is not competent evidence of what services these plans *actually received* from their recordkeepers; at most, it shows what services they *reported* receiving. *See Alas*, 2021 WL 4893372 at *10 (rejecting reliance on comparator plans' Form 5500 data to establish truth of recordkeeping fees paid in exchange for specific services). Plans often evaluate and report recordkeeping services fees in different ways. *See id.* But even taking Plaintiffs' reliance on the reported data at face value, it is obvious that the Comparator Plans

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS

- 19 -

CASE NO. 8:22-CV-01158-JWH-JDE

do not even *claim* to be receiving the same services from their recordkeepers that the Plan received from Mass Mutual.

**Fourth**, Plaintiffs' benchmarking allegations ignore the limitations and assumptions inherent in the data. For example, Plaintiffs concede that some recordkeepers' direct compensation is attributable to participant-specific charges for participant-specific services, such as loan processing. Compl. ¶¶ 58-60, 77. Their reliance on a service provider's *total* "direct compensation" improperly calculates an average, per-participant fee when some of the charges were not allocated to the plan as a whole.

**Fifth**, Plaintiffs used a different numerator (their flawed calculation of direct compensation plus an unspecified estimate of indirect compensation) to calculate a per-participant fee for the Plan than they did for the Comparator Plan (which includes only a calculation of direct compensation). Thus, Plaintiffs increased the Plan's fees, which had the effect of increasing the alleged per-participant fees. The Court should reject this comparison, because Plaintiffs did not "provide any figures, estimates, or formulas from which the Court could reasonably infer Plaintiff[s] obtained" their estimates and they did not similarly increase the Comparator Plans' estimated fees. *Cunningham v. USI Ins. Servs., LLC*, No. 21 Civ. 1819 (NSR), 2022 WL 889164 at *5 (S.D.N.Y. Mar. 25, 2022).

These inherent flaws with relying on Form 5500 data are exactly why the Department of Labor, in another context, has instructed that the compensation disclosures reported on Form 5500s are *not* the most reliable method of assessing a plan's recordkeeping and administrative fees. The DOL requires individual retirement account ("IRA") advisors to provide investors who are rolling over funds from ERISA-governed plans (like 401(k) plans) into IRAs with specific disclosures about "the fees and expenses associated with both the Plan and the IRA," including "whether the employer pays for some or all of the Plan's administrative expenses." Prohibited Transaction Exemption 2020-02 ("PTE 2020-02"), Improving

1   Investment Advice for Workers & Retirees, 85 Fed. Reg. 82798, 82830-31 (Dec.

2   18, 2020).[30] And it requires that advisors "make diligent and prudent efforts" to

3   obtain that detailed fee information, starting first with the Plan's 29 C.F.R. §

4   2550.404a-5 disclosures that are made available to participants each year. *Id.* at

5   82832. Only if the investor is "unwilling to provide the information" from those

6   disclosures, "even after a full explanation of its significance," may the IRA advisor

7   look to "alternative data sources" such as Form 5500 data, to make a "reasonable

8   estimation of expenses, asset values, risks, and returns" of the Plan. *Id.* But in

9   formulating a "reasonable estimation" based on such "alternative data sources," the

10  IRA advisor must "document and explain the assumptions and their limitations"

11  inherent in relying on such limited data, and in all cases must make comparisons

12  only to "typical fees and expenses for the type and size of Plan at issue." *Id.*

13         For all, or any, of these reasons, Plaintiffs have not presented a meaningful

14  benchmark to permit this Court to question the *conduct* of the Plan's fiduciaries.

15  *See Wehner*, 2021 WL 2417098 at *5 (rejecting as comparators any plans that

16  engaged a different recordkeeper from the defendant plan). The Comparator Plans

17  chosen by Plaintiffs cannot establish a benchmark for the Plan's recordkeeping and

18  administrative fees. *See, e.g.*, *Wehner*, 2021 WL 2417098 at *5 (rejecting as

19  comparators any plans that did not have "asset and participant sizes" that were

20  comparable to the defendant plan); *see also CommonSpirit*, 37 F.4th at 1169

21  (same). The above-cited precedent and DOL guidance reveal the significant

22  problems with relying on Form 5500 recordkeeping data to try and support claims

23  of fiduciary imprudence. Plaintiffs' conclusory allegations that all of the plans

24  received "materially identical services," Compl. ¶ 114, and their attempt to compare

25  fees, are flawed and unreliable, even at the pleading stage. Plaintiffs failed to plead

26

---

27  [30]  *See also* New Fiduciary Advice Exemption: PTE 2020-02 Improving Investment Advice for Workers & Retirees Frequently Asked Questions, U.S. DEP'T OF LABOR, *available at* https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/new-fiduciary-advice-exemption (Apr. 2021).

28

facts to give rise to a plausible inference of imprudence, and Count I should be dismissed with prejudice.

### D. Counts I and II Fail to State a Claim against Allied Universal.

Counts I and II are against all named Defendants (Universal Services, Allied Universal, and the Committee), *see* Compl. ¶¶ 154-65, but Plaintiffs fail to plead that Allied Universal acted as a fiduciary to the Plan as to either Count. The claims against Allied Universal should be dismissed.

An ERISA breach of fiduciary duty claim is only valid against an ERISA fiduciary. *See Pegram v. Herdrich*, 530 U.S. 211, 222-23 (2000). Therefore, "[i]n every case charging breach of ERISA fiduciary duty, … the threshold question is … whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Id.* at 226.[31] An entity "may be a fiduciary with respect to some actions but not others." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 654 (9th Cir. 2019). A plan sponsor is not necessarily the plan administrator and is not necessarily an ERISA fiduciary for all purposes. *See, e.g.*, *Beck v. Pace Int'l Union*, 551 U.S. 96, 101 (2007) (noting that employer may have "dual roles as plan sponsor and plan administrator" and that its "fiduciary duties under ERISA are implicated only when it acts in the latter capacity"). Allied Universal is *neither* the plan sponsor nor the plan administrator, and Plaintiffs do not allege otherwise or claim that some other responsibilities of Allied Universal transformed it into a fiduciary for purposes of Mass Mutual's compensation. *See* Compl. ¶¶ 44-45 (alleging that Universal Services and

---

[31] Some fiduciaries are "named (or statutory)" fiduciaries, meaning they are named as such "in the plan instrument" or are identified as such "pursuant to a procedure specified in the plan." *Acosta v. Brain*, 910 F.3d 502, 516 (9th Cir. 2018). Other fiduciaries are "functional" fiduciaries, meaning they become fiduciaries by "exercis[ing] any discretionary authority or discretionary control respecting management of such plan or exercis[ing] any authority or control respecting management or disposition of its assets," or by having "discretionary authority or discretionary responsibility in the administration of such plan." *Id.* (quoting 29 U.S.C. § 1002(21)(A)).

Committee are plan administrators with responsibility for "day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A)"). Both claims against Allied Universal must be dismissed.

### E.     Plaintiffs Fail to State a Claim for Breach of the Duty to Monitor (Count II).

Count II brings an ERISA § 502(a)(2) claim against all Defendants for an alleged violation of the "duty to monitor." Compl., ¶ 168. The Court should dismiss it for two reasons. First, it is derivative of Count I, so it fails along with Count I. A failure-to-monitor claim is "derivative" of and depends on an underlying breach of fiduciary claim. *See White I*, 2016 WL 4502808 at *19. Because Plaintiffs have failed to state a claim for breach of fiduciary duty against any Defendant in Count I, Count II necessarily fails, too. *See id.* ("Thus, if plaintiffs cannot state a claim as to the first through fourth causes of action, they cannot maintain a claim that Chevron Corporation failed to monitor the fiduciaries.").

Second, even if Plaintiffs had stated a claim for breach of fiduciary duty (and they have not), their Complaint fails to plead facts supporting an independent failure-to-monitor claim. The duty to monitor is derived from ERISA's general standard of prudence in § 404(a)(1)(B) and also focuses on the *conduct* of the monitoring fiduciary. *See, e.g.*, *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). Simply failing to prevent an alleged breach of fiduciary duty does not mean that a fiduciary separately breached its duty to monitor. Such a rule would "require every appointing Board member to review all business decisions of Plan administrators" and "would defeat the purpose of having trustees appointed to run a benefits plan in the first place." *Id.* Vague and conclusory allegations that a fiduciary "fail[ed] to monitor the conduct" of other fiduciaries, absent "any factual allegations" identifying specific actions the fiduciary took (or failed to take), fail to state a failure-to-monitor claim. *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1839 (VAB), 2016 WL 7494320 (D. Conn. Dec. 30, 2016); *see also White*

1    *I*, 2016 WL 4502808 at \*19 (dismissing failure-to-monitor claim when "plaintiffs

2    allege no facts showing how the monitoring process was deficient").

3
## IV.
## <u>CONCLUSION</u>

4

5        For the foregoing reasons, and for such other and additional reasons as may

6  be shown upon any hearing of Defendants' Motion, Defendants respectfully request

7  that the Court dismiss Plaintiffs' claim with prejudice for failure to state a claim

8  upon which relief may be granted.

9

10  Dated: August 8, 2022          FAEGRE DRINKER BIDDLE & REATH LLP

11

12                 By: */s/ Cheryl D. Orr*

13                      Cheryl D. Orr
                    Sara Ehsani-Nia

14                      Richard Pearl
                    Kimberly Jones

15                      Emily A. Kile-Maxwell

16                      Attorneys for Defendants

17

18

19

20

21

22

23

24

25

26

27

28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
SAN FRANCISCO

MEMO OF POINTS & AUTHORITIES ISO
MOTION TO DISMISS                    - 24 -                    CASE NO. 8:22-CV-01158-JWH-JDE